## JAMES ROGERS, plaintiff in error, *v.* THE PEOPLE, defendants in error.

The act of 1855 gives to the Supreme Court the power, on writ of error, to grant a new trial where the verdict is against the weight of evidence.

On a trial for murder, where the intention of the prisoner is sought to be ascertained for the purpose of determining whether the offence is murder or manslaughter, the jury are authorized to take into consideration the intoxication of the prisoner, as bearing upon the question of intent.

And where, on such a trial, the prisoner's counsel requested the court to charge "that if it appeared by the evidence that the condition of the prisoner from intoxication was such as to show that there was no intent or motive to commit the crime of murder, that the jury should find a verdict of manslaughter," and the court refused so to charge, a new trial was granted.

Though, it is true, that if a man voluntarily make himself drunk, his drunkenness is no excuse for any crime he may commit while so intoxicated, yet, in homicides of different degrees according to intent, and in larcenies, forgeries and other crimes depending on intent or knowledge, the intoxication of the prisoner is, in many cases, a material circumstance for the consideration of the jury.

THIS case came up on writ of error to the Court of General Sessions of the city and county of New-York.

The plaintiff in error had been indicted in that court for the murder of John Swanston, and pleaded not guilty. The issue was tried before the city judge in November, 1857, when the following evidence was given:

*Eben Hassel*, M. D., was called and sworn as a witness for the prosecution, who testified as follows : I am a physician, residing at No. 71 West Thirty-seventh-street; I made the *post mortem* examination on the body of the deceased, John Swanston, at his late residence ; I found the wound to be an incised wound, inflicted with a sharp instrument; the wound was not less than three inches in depth; the wound was situated on the junction of the fifth rib with the breast bone, and the artery of the heart was penetrated; I should judge that the wound was inflicted with a large dirk knife, and was the cause of death.

On being *cross-examined* he further testified : I am certain the depth of the wound was not less than three inches; there were no other wounds on the body; the deceased was a medium sized man, about five feet eight or nine inches high; the wound was upward and inward tending toward the left; it is very probable that the blow was struck from the right side; it was my opinion from the character of the wound, that it was inflicted with a dirk knife.

*Margaret Swanston* was next called and sworn as a witness for the prosecution, and testified as follows : I am the wife of deceased; on Saturday night, the 18th of October, 1857, was out with my husband; had been to market and was returning; my husband and myself were coming down Twenty-first-street, the upper side toward Tenth-avenue; I was leaning against my husband's left side; he had a lantern not lighted in his right hand; I was on his left side; before we turned the corner we heard words of loud talking, like persons quarreling; it was not a great way from the corner; I was on the inside on Twenty-first-street, and as we turned the corner, I was toward the boys; we were going

home to Twenty-seventh-street, between Tenth and Eleventh avenues; we were going straight ahead to cross the avenue, when the young men shouldered me; they came against me and pushed me against my husband; the young man who afterwards struck the blow, asked my husband what he was saying; my husband answered, "what is that to you;" one of the men that was with him said, "they are not talking to you;" they had then passed us; my husband turned his head toward them, and they turned to come back, and we turned, and they faced us, and the yound man who struck the blow was held by the other two; he broke away from them, sprang straight up, and struck at my husband, and aimed the blow at his breast, and then ran straight on up the avenue; it was on the cross-walk of the avenue where the blow was struck, about a yard from the curb; as we turned they were close upon us; my husband, as soon as he was struck, cried, "I am murdered," and ran as far as the curb; I never saw them before.

On being *cross-examined* by the prisoner's counsel, the witness further testified: The killing was on the Tenth-avenue, on Saturday evening; could not say the day of the month; we came down Twenty-first-street, from Ninth-avenue, toward the Tenth-avenue; we turned to go up Tenth-avenue, homewards; we went up the east side of the Tenth-avenue; I could not say where we were exactly; when we heard the noise, were approaching Tenth-avenue; when we got to the corner, the boys came right upon us; they shouldered me in passing; it was intentional, their pushing against me; could not say how hard they hit us; they were three abreast walking down, and speaking loud as if excited, angry and quarreling; my husband spoke to them when I was hit; the other two said, "he is talking to his wife, and not to you;" cant say how far they got when they turned back; my husband spoke to them; we might have been a yard or two in the street, at the time they came up; I was on the inside coming down Twenty-first-street; dont know whether

Rogers *v.* The People.

I would be on the north side; I was on my husband's right on the Tenth-avenue; they did not come up to me; approached my husband first; my husband partially turned round; the three were together; one struck my husband, and made off; the whole three were close upon us, when my husband was struck; it was a dark night; I think it rained; it was cloudy; I could see the three; dont know that I could pick out any of the three; did not see his features; did not know the accused; never saw him before.

*By the Prosecution.* Can describe the color of the coat of the one who struck the blow; he had on a dirty drab; it was close on ten o'clock, P. M.; I could not say my husband was dead when I went up to him; he fell on his face.

*Robert Rae* was then called and sworn for the prosecution, who testified: He is a physician; lives second door in Tenth-avenue, from the corner of Twenty-first-street; on the Saturday night in question I was in my room, the front one, when I heard the cry of murder; I raised my window, saw three young men; two of them were together; they were running down the Tenth-avenue; the third one I saw best; he was eight or ten steps behind the other two; he was the largest of the three; he had on a drab coat, dark pantaloons; I saw the deceased lying on the street; he had fallen before I saw him; as soon as I heard the cry I raised the window; I saw the deceased; he was quite dead when I went across to where he lay; it was about five minutes after I heard the cry; the three young men ran; the last one with drab coat ran very fast.

On *cross-examination*, witness says: I was not acquainted with deceased; the coat the third boy had on when running was a drab coat like a fireman's coat; he also had on a cap; all three had on caps.

*Daniel Cunningham* was sworn as a witness for the prosecution, who testified as follows; I live on the Tenth-avenue, between Sixteenth and Seventeenth streets; know the pri-

soner; knew him about two weeks before the murder; on this Saturday night I met him and McGivney coming up Seventeenth-street near Eighth-avenue, from the Ninth-avenue; Rogers had on a light coat, drab, like a fireman's; also a cap; he is the largest of the three; this was about eight o'clock; he asked me to have a drink; we first went down Seventeenth-street, between Eighth and Ninth avenues, and took some beer; we stayed there five minutes, and then went up Eighth-avenue, and stopped at Twenty-fourth-street five or ten minutes; then to Twenty-fifth-street, and took some more beer; then to Tenth-avenue and Twenty-sixth-street; Rogers wanted to go down Twenty-sixth-street, but McGivney would not go; we turned down then to Twenty-second-street and met a boy; Rogers asked him for a piece of an apple; the boy said he had but one, and fired the apple at him, and Rogers run after him; we then went across the street and down the avenue as far as Twenty-first-street, on the side towards Ninth-avenue; we were walking along; Rogers was drunk, and we were trying to get him home; the man and woman were coming down, and Rogers staggered up against him; he knocked against the woman, and the man turned round and made some remark; McGivney told the man not to mind Rogers, he was drunk; the man made a crack at Rogers; the blow went over his head; they got in a fight, and we took Rogers away; he was stronger than we, and got away from us; Rogers hit the man as well as he could; he struck him about the body; this was in the street; Rogers ran away first; did not see Rogers have anything in his hand; I saw Rogers leave the man; the man screamed murder right away; I did not see Rogers have a weapon that night, or a knife; he went up town; we down; did not see him after until I saw him in the Tombs.

On being *cross-examined,* witness further testified: I was arrested the Tuesday morning after; the policeman who arrested me, told me I would not be prosecuted if I testified

here; and that I must tell the truth; I did not know a man was killed till the next day, and went out as usual; Rogers hit against the woman, and Swanston asked what he did that for, and then the fight commenced; we drank about two times that night; don't know how many times Rogers drank.

*Clark S. Dunning* was then called as a witness, and sworn for the prosecution, who testified: I reside at 169 Tenth-avenue, west side, second door from Twenty-first-street; I heard the cry of murder; was in front room; had raised the window to adjust the blinds, to let the lamp-light in; my attention was called by the cry of murder; I saw a man, woman and three boys or young men; the man or woman had a basket and lantern not lighted; the boys passed down the Tenth-avenue, east side; one was larger than the others, and had on a dirty drab coat and red shirt; he was the largest; when I saw the boys, he was seven or eight steps from them; these were all the persons in the street at the time; I saw the tallest boy near the man; the man fell almost immediately, before he could have gone twenty-five feet; the two in black then passed down the avenue, and the tallest boy made a circuit up and across the street, and I lost sight of him behind some wagons; before the cry of murder I noticed the boys; there were no other persons in the street; as soon as the cry of murder the large boy appeared to have been in contact with the man; largest was nearest the man; the small boy said, "Don't meddle with the man;" I saw the large boy's hand come from breast of deceased, as if he had struck a blow; the two smaller boys passed down Tenth-avenue, and I lost sight of them; the largest boy was a few steps behind; saw the deceased fall after he went a few steps; I went out immediately; the boys ran fast; it would have been impossible for me to catch them; they did not appear to be intoxicated; the largest boy passed off the sidewalk and made a circuit round a wagon, and I lost sight of him.

On being *cross-examined*, he said: I am almost opposite the street lamp; it is on the east side, fifty-five or sixty feet from the corner north; my house is also north of the corner; the deceased was very near the corner; the three boys were together on the sidewalk near the corner; they appeared to be passing down the avenue; the man and woman were near the corner; did not see them more than a minute before the cry; I saw a motion of the tallest boy's hand as if he were striking; saw no blows struck; the motion was like a swing of the hand; did not watch their motions all the time; I thought he had stabbed him; I saw the motion made as if he had stabbed him before the cry of murder, and I cried murder before deceased hallooed out.

*David Scott* was then called and sworn as a witness for the prosecution, who said: I heard the cry of murder that night; saw the boys; saw them ten minutes before the cry of murder; Rogers was the largest boy; he had on a drab and coat, black pants and cap and red shirt; when the tallest boy asked me for a piece of an apple, he tried to get something out of his pocket; I saw the handle of a knife about seven or eight minutes, before the cry of murder, as he (Rogers) tried to get it out of his pocket; Rogers took his hand out of his pocket, and ran after me; I am the boy he asked for the apple.

The prisoner's counsel objected to the evidence of this witness as immaterial and irrelevant; the court overruled the objection, and the counsel excepted.

On being *cross-examined*, he said: This was on the corner of Twenty-second-street and Tenth-avenue; I was standing in the door; he asked me for the apple and struck me, and I threw the apple at him; he dared me to come out; the boys took him away; he broke away from them; he was taking his hand out of his pocket; did not see the blade; it looked like a gray handled jack-knife; did not see them before; Rogers talked as if he were a little drunk.

Rogers *v.* The People.

*Stephen McGivney* was then called and sworn for the prosecution, who said: I am nineteen years old; have known Rogers for about eleven months; met him that night about half-past six o'clock, on Tenth-avenue, near Sixteenth-street; we afterwards went up to the corner of Tenth-avenue and Twenty-second-street; we met a boy, and Rogers asked him for a piece of apple; the boy said it was the only one he had, and Rogers made a kick at him, and then we went down toward Twenty-first-street; we met a man and woman coming down Twenty-first-street; Rogers bumped against the woman; they were stepping across the curb; the man turned around and asked him what he did it for; I told the man to excuse Rogers as he was drunk, and we took hold of him, but he (Rogers) said he wanted to fight, he would not be excused; we then let go of him, and he then went up to the man, and they both got scolding; I was about ten feet off; I saw the man make a crack at Rogers, which did not hit him, but went over his head, and Rogers made a crack back and hit him; then the man struck Rogers, and Rogers hit the man again, and in a second I heard the cry by the man of murder, he putting his hand to his breast; we stood still, and the man ran after Rogers; did not see Rogers after that until Sunday night; met him at his house in Twelfth-street; it was about eight in the evening; saw him about fifteen minutes; he was in the bed-room, sitting on the bed; I did not see him have anything in his hand on the night of the murder; Rogers on that night had on a drab coat, red shirt, dark pantaloons; I had a lilac shirt on, and was dressed as I am now.

On being *cross-examined*, he said: We drank twice that night; Rogers was drunk, and we were helping him home; he staggered a little; he said to me, " Here comes some bad woman;" he was on the end as we walked; we were making a noise, and he was hallooing; when the blows were struck I was about ten feet off.

*Inspector Lefferts* was called and sworn by the prosecution, and testified: I am attached to the detective force; I arrested Rogers in New Brunswick, New Jersey, the Friday after the murder; I asked him if he was willing to go back to New-York without a requisition from the governor; he said he would; I asked him how he could commit such a crime, and he so young.

Prisoner's counsel objected to the reception of this testimony as improper, and as to any admissions made to the witness.

Witness said on *interlocutory cross-examination*, that he held no process against him; that he took him from the constable at New Brunswick jail; the prisoner came voluntarily.

Witness further stated that he made no threats or promises, and that his admissions were voluntary.

Prisoner's counsel then objected, not that any inducements had been used to extort a confession, but on the general grounds that confession made by a party when under arrest could not be used against him; but the court overruled the objection and admitted the testimony, to which the prisoner's counsel excepted.

He answered, he was drunk; I asked him what the blow was struck with.

Same objection, ruling and exception.

He said it was done with a common pocket knife; that one of the other boys told him the man was dead, and that he had better leave the city, and upon starting he threw away the knife in Twelfth-street; he said he was not in the habit of getting drunk; that the other boys induced him to drink that night.

The prosecution here rested, and the counsel for the prisoner, after stating his case to the court and jury, called as a witness

*Catharine Rogers*, who, being sworn, testified: I am prisoner's sister; my brother had been at work at Wood-

Rogers *v.* The People.

bridge, New Jersey, for Mr. Hoovert, who is now sick abed at home.

*Bridget Rogers*, sworn for defence, testified: I am prisoner's mother; about six weeks before this happened he came home from Mr. Hoovert's, where he had been at work, sick with the dumb ague; on this Saturday night, he came home about ten o'clock; he was very bad; he fell helpless on the floor; he was so drunk that my daughter and myself had to put him to bed and undress him; he had always been quiet and peaceable before this, staying home mostly; he remained in the house till Sunday night, and after McGivney came to see him, he went away; he never carried a pistol or dirk knife, to my knowledge; only a small pocket knife.

*Bridget Rogers* called, and sworn for the defence. I am prisoner's sister; don't recollect when he returned from Woodbridge; saw him about two weeks before the murder; he was home every night; he was working in a tin shop; he came home that night near ten o'clock; was so drunk he could not walk; mother and I put him to bed; he left Monday morning; did not see him; did not see him carry anything but a pocket knife; had two small blades; he never was drunk before that night; McGivney was to see him once; the other was not.

*Mary Branigan* called, and sworn for defence. Don't know prisoner, nor McGivney; know Cunnigham; saw Cunningham that night about ten o'clock; saw him first on Twenty-sixth-street and Tenth-avenue; there were a number with him; he was standing still; he stopped my husband and put his foot before him, and would not let him go; they followed us down street; there were three together then; Cunningham walked up to my husband, put his hand in his pocket and took a shilling out, and when I said he had done so, Cunningham struck me, and I was sick for ten days; he took from his pocket a knife, or revolver; it looked like a wide blade of a knife; each of the three then

ran across the avenue; have known Cunningham about four years; he has a bad character; have known him to lick his mother for four years; never heard him to be honest.

On being *cross-examined,* she said: The other boys said it was a shame for him, Cunningham, to strike a woman; I was excited at the time; I shouted murder at the time; I don't know the prisoner.

After other witnesses had been sworn and testified for the defence, the case was summed up to the jury.

The judge charged the jury that the killing of a human being, without the authority of law, unless it be man-slaughter, or excusable or justifiable homicide, is murder when perpetrated from a premeditated design to effect death, and if the intent was formed a minute before the blow was struck, it is willful, deliberate and premeditated killing, as well as if intended for an hour or day.

That manslaughter in the first degree is the killing of a human being, without a design to effect death by the act, procurement or culpable negligence of another, while the prisoner was engaged in the perpetration of any crime or misdemeanor not amounting to felony, or in an attempt to perpetrate such crime or misdemeanor, in such cases where such killing would be murder at the common law.

That manslaughter in the third degree is the killing of another in the heat of passion, without a design to effect death, by a dangerous weapon.

That when the killing is the effect of malice or general depravity, it is murder; and when without malice, express or implied, or without any justification or excuse, it is man-slaughter, or when without malice, but caused by sudden passion and heat of blood, it is also manslaughter.

That the first question to be determined by the jury was: Had a murder been committed, if so, by whom; and if from the evidence in the case they should find that the mortal blow was struck by the prisoner; then the next question for them

to determine was : Whether it was murder, or manslaughter in the first or third degree.

That if, from the evidence, they were satisfied that the prisoner had time to think, and did intend to kill, if he conceived the intent, but on the instant the blow is struck, it is murder. If, on the other hand, the evidence satisfied them that the killing was done without a design to effect death by the act, procurement or culpable negligence of the prisoner, it would be manslaughter in the first degree, while the prisoner was engaged in the perpetration of any crime or misdemeanor not amounting to felony, or in an attempt to perpetrate such crime or misdemeanor, in such cases where such killing would be murder at the common law.

And if they were satisfied that the mortal blow was struck in the heat of passion, without a design to effect death, by a dangerous weapon, then it would be manslaughter in the third degree.

And that they were to apply the rules of law laid down by the court to the evidence in the case, and find their verdict accordingly.

To which charge the prisoner's counsel duly excepted.

The counsel for the prisoner requested the court to charge that if it appeared by the evidence that the condition of the prisoner from intoxication was such as to show that there was no intention or motive to commit the crime of murder, that the jury should find a verdict of manslaughter ; but the court refused to instruct the jury in the words of the proposition, but charged that, under the old law, intoxication was an aggravation of crime ; but that intoxication never excused crime, unless it was of the degree to deprive the offender of his reasoning faculties.

To which refusal and charge, the prisoner's counsel excepted.

The jury then retired, and after deliberation, found a verdict of guilty against the prisoner.

Rogers *v.* The People.

After sentence was pronounced a writ of error was sued out in behalf of the prisoner, and proceedings upon the judgment were stayed by the direction of one of the justices of this court.

*E. W. Andrews* and *George D. Kellogg*, for the plaintiff in error.

The evidence shows, first, that the prisoner never carried or used any knife except an ordinary pocket knife; second, that at the time of the alleged murder the prisoner was intoxicated to such an extent as to be deprived of his reason and faculties; third, that this intoxication was induced by his companions.

I. The court erred in admitting the testimony of David Scott, because it was immaterial, irrelevant and insufficient, the prosecution endeavoring thereby to connect the prisoner with a knife a short time before the killing; and remote evidence of such a nature, or the proof of collateral matters, should not be allowed to form a link in the chain of testimony. (1 *Greenl. on Ev.*, § 52; *Am. Cr. L.*, § 647; *People* v. *Wilson*, 2 *Port.*, 511; 2 *Russ. on Cr.*, 772; 2 *Cush.*, 590; *The State* v. *Stone*, 4 *Humph.*, 27.)

II. The court erred in admitting as evidence the communications of the prisoner to the witness Lefferts because, first, the prisoner was under arrest and in custody at the time, second, the manner of the officer and the form of his questions were improper, and of themselves constituted a threat or intimidation, and would necessarily operate on the fears of the prisoner; third, the admissions are not voluntary within the meaning of the rule, for it is the duty of the officer, and the right of the prisoner, to be informed that his statements might be used in evidence, and only after such caution are admissions voluntary to that extent that they may be used as evidence. (1 *Greenl. Ev.*, §§ 219, 220; *Comb* v. *Taylor*, 5 *Cush.*, 602; *Am. Cr. L.*, § 685; *The State* v.

*Long, Hayw.,* 455; *The State* v. *Deathridge,* 1 *Smeed,* 75; *Rex* v. *Mills,* 6 *Carr. & Payne,* 146 ; *Rex* v. *Jones, Russ. & Ry.,* 151, 152; *Rosc. Cr. Ev.,* 36 ; *Drew's case,* 8 *Carr. & Payne,* 140 ; *Regina* v. *Fleming,* 1 *Armstrong, M. and O. R.,* 330 ; *Palmer's case,* 16 *Johns.,* 143.)

III. The court erred in the charge because : First. If the prisoner intemperately used an instrument not in its nature a deadly weapon, while intoxicated, such intoxication might induce the jury to less strongly infer a malicious intent. (*Rex* v. *Makin,* 7 *Carr. & Payne,* 297; 2 *Park. Cr. R.,* 235); Second. When the question of intent or premeditation is concerned, evidence of drunkenness is material in determining the precise degree of guilt (*Pennsylvania* v. *McFall, Addis.,* 957; *Am. Cr. L.,* §§ 41, 44; *Regina* v. *Crane,* 8 *Carr. & Payne,* 541 ; *Regina* v. *Thomas,* 7 *Id.,* 817; *The State* v. *Pigman,* 14 *Ohio,* 555 ; *Hall* v. *The State,* 11 *Humph.,* 154; *The United States* v. *Rondenbush,* 1 *Bald.,* 514; *Swan* v. *The State,* 4 *Humph.,* 136; *The State* v. *Bullock,* 13 *Alabama,* 413); Third. The intoxication is always to be taken into account, when provocation has been given, as a first blow struck, because a drunken man is more easily excited to passion than a sober one (*Rex* v. *Thomas,* 7 *Carr. & Payne,* 817; *McFall's case, Addis.,* 257; *McCant's case,* 1 *Speers,* 384; *Cornell's case, Martin & Y.,* 147; *Swan's case,* 4 *Humph.,* 136; 3 *Am. Jur.,* 1–20; 3 *Greenl. Ev.,* §§ 6, 148); Fourth. The intoxication of Rogers was of the degree of "inculpable," justly attributable to others; or, as Hale (*p.* 632) expresses, " the contrivance of evil minded persons." (3 *Greenl. Ev.,* § 6; 2 *id.,* 359, *note*); Fifth. The whole conduct of Rogers, on the night in question, was that of a boy maddened by liquor, to which he was unused, not voluntarily, but "inculpable," and his conduct that of a madman without purpose or motive ; Sixth. The common law characteristics of murder are preserved, except when altered by statute. Our statutes have substituted "premeditated design to effect death " for " malice aforethought," but as to the

person and status, the language of the elder style prevails, as when a man of sound sense, &c. ( *Coke's definition,* " *Murder;* " *Rex* v. *Hough,* 1 *Leach,* 368 ; *The People* v. *Mann, MSS. case, by the Court of Appeals, Brown, J.* ) ; Seventh. The court erred in limiting the intoxication to a total deprivation of reason by reason of it ; whereas, if it clouds the reason, and a party assailed uses a weapon and kills his adversary, his offence is only manslaughter (2 *Bishop Cr. L.,* § 632 ; *Ray's Med. Jur.,* § 445 ; 8 *Carr. & Payne,* 541 ).

IV. The verdict is against the evidence, because it appears that the death of Swanston was caused in mutual combat ; that the mortal blow was struck in the heat of passion, and without any premeditated design to kill. ( *Am. Cr. L.,* 988 ; 1 *East P. C.,* 243, 244 ; 1 *Carr. & Payne,* 437 ; *Commonwealth* v. *Daly,* 4 *Penn. L. Jour.; The People* v. *Clark,* 3 *Seld.,* 385 ; *The People* v. *Sullivan, id.,* 396 ; *The People* v. *Johnson,* 1 *Park. Cr. R.,* 154, 298 ; *The People* v. *Curtis, id.,* 154 ; 1 *Russ. on Cr.,* 707 ; *Horton on Homicide,* 197 ; *The State* v. *Ferguson,* 2 *Hill ; South Carolina,* 619 ; *The State* v. *Law,* 4 *Indiana,* 113 ; *Stewart* v. *The State,* 1 *Ohio,* 66 ; 3 *Greenl. on Ev.,* § 121.)

*P. B. Sweeny* (District Attorney ), for the people.

I. The verdict of the jury was not against the weight of evidence.

II. The verdict against the prisoner was not against law. This point involves the consideration, first, of the objections to testimony on the part of the prisoner ; second, of the judge's charge to the jury and the exceptions thereto.

First. As to the objections to testimony.

1. The testimony of David Scott, the boy from whom the prisoner asked the apple, and upon whom he threatened or attempted to draw the knife, was competent. It showed three important facts : first, that the prisoner had a knife ; second, that he was not helplessly drunk, for he ran after this boy,

Rogers *v.* The People.

and, third, the disorderly character of the conduct of the prisoner a few moments before the affray in question, and that he was not waiting for provocation, but that he was making or courting it, relying upon his knife.    2. The testimony of Inspector Lefferts as to the confessions of the prisoner at the time of his arrest, was properly received.    It was proved, and even admitted by the prisoner's counsel, that they had not been extorted from the prisoner.    The mere fact of his being under arrest did not render the confessions improper. (*The People* v. *McMahon,* 2 *Park. Cr. R.,* 663 ; *The People* v. *Hendrickson,* 1 *id.,* 406, 416.)

Second. As to the judge's charge to the jury, and the exceptions thereto.    The charge distinctly put it to the jury that, without an intent to kill, the prisoner could not be convicted of murder.    This was done in two different instances. In rendering their verdict the jury have found that the prisoner had such an intent at the time of the commission of the act.    The charge is consistent with the law established by the Court of Appeals. (*The People* v. *Clark,* 3 *Seld.,* 385 ; *The People* v. *Sullivan, id.,* 396.)    The charge is even more favorable to the prisoner upon the point of murder than the law required.    It tells the jury that if the prisoner had time to think and then conceived the intent to kill, his act is murder.    Without time to think, with the bare intention to kill, by the law as it now stands in this state, his act would be murder.

III. The court did not err in the direction it gave the proposition of the prisoner's counsel in relation to the effect of intoxication upon the prisoner's act.    1. The proposition was inartificially put.    It speaks of an intention to commit the crime of murder.    The prisoner might have an intention to kill, and his act might thus amount to murder, but he could hardly be said to have the intention to commit murder. Murder· is the technical term applied in law to the act embodying such an intent.    2. By convicting of murder, and so finding that the prisoner had the intent to kill, the jury

found that the prisoner was in a mental mood admitting of such an intent. He could not have the intent, unless he was in a condition to form or conceive it. 3. Drunkenness or intoxication is only a defence where it argues or proves that the mind of a party, from his physical condition, was incapable of conceiving or entertaining an intent to kill; as where a party is so besotted by drink as to be physically and mentally insensible. (*The People* v. *Hammill,* 2 *Park. Cr. R.,* 223; *The People* v. *Robinson, id.,* 235; *United States* v. *Drew,* 1 *Benn. & Hurd's Lead. Cr. Cas.,* 113; *Freeman* v. *The People,* 4 *Denio,* 9.) 4. The court charged correctly upon the point, in instructing the jury that the drunkenness or intoxication necessary to make out an excuse or defence, must deprive the offender of his reasoning faculties.

IV. Even if there was an error (which clearly is not the fact) in the charge of the court, upon or as to this proposition of the prisoner's counsel, it would not entitle the prisoner to a new trial. There was no testimony in the case to show that at the time the prisoner inflicted the fatal stab, he was in the state suggested in or intimated by the proposition. He may have been desperate, but he was not unconscious or insensible from drink. Excited by liquor, and emboldened by or relying upon his knife, he may have been reckless of consequences, but he was still in a condition to be both susceptible of motive and capable of intention. His conduct not only exhibits consciousness, but the most marked cunning and deliberation. Whether it was because the liquor he had drank had not fully enslaved him at the time he committed his crime, and worked upon him more fully afterwards, or, whether, intermediate the deadly scene and his return home, he had indulged in additional drink, the fatal occurrence points to him as one who was perfectly aware of all he was doing. It is well settled in this state, that an erroneous instruction to the jury, upon an abstract legal proposition, is no ground for interfering with the verdict. It is only of directions, which are applicable or can be

Rogers *v.* The People.

applied to the facts, that error is predicable. The practice of involving the court, on the trial, in legal abstractions, is not to be countenanced or tolerated. ( *Shorter* v. *The People* 2 *Comst.*, 193; *S. C.*, 4 *Barb. S. C. R.*, 460; *The People* v. *Robinson*, 2 *Park. Cr. R.*, 235.) If the prisoner went into a fight with an unarmed man, relying upon his knife, an English judge would have instructed the jury, if a homicide was the result, that the act was murder. (*Regina* v. *Smith*, 8 *Carr. & P.* 160.)

*By the Court*, SUTHERLAND, J.—Although the statute under which this case has been brought here by writ of error, gives this court the power to grant a new trial, if the court were satisfied that the verdict against the prisoner was against the weight of evidence ( *Laws of* 1855, *p.* 613, § 3 ), yet we cannot say in this case, that the verdict was against the weight of evidence.

According to the testimony of Margaret Swanston, the wife of the deceased, there was no mutual combat, and the fatal blow was struck by Rogers without a blow from her husband. Her testimony is partially confirmed by the witness, Clark S. Dunning.

I cannot say that their testimony did not have and ought not to have had more weight with the jury, than the testimony of the prisoner's two companions, Cunningham and McGivney, although introduced and sworn on the part of the people, who testified that blows passed between the prisoner and the deceased, on the deceased asking the prisoner why he run against his wife.

The jury had the witnesses before them, and could judge better than we can what weight to give their respective testimony.

Nor do I think there was error in admitting the testimony of David Scott, the boy from whom the prisoner asked the apple, a few minutes before his murderous attack upon the deceased; or in admitting the testimony of Inspector Lef-

ferts as to the confessions of the prisoner at the time he was arrested; as to the testimony of the former, it was certainly important to show that the prisoner had a knife, and what kind of a knife, and the disorderly conduct and reckless spirit of the prisoner but a few minutes before he struck the deceased with some deadly instrument; and as to the testimony of Lefferts, there is nothing but the mere circumstance that the prisoner was under arrest when he made the confession, from which we can infer that they were not voluntary, or made under the influence of a threat, or from intimidation.

But the exceptions of the prisoner to the charge of the court below, and to the refusal of the court to charge as requested by him, deserve consideration.

All the witnesses who speak on the subject agree in saying that the prisoner was excited by drink; his companions, Cunningham and McGivney, say he was drunk; his mother and sister say that he was very drunk. The degree of intoxication is not important in looking at the exceptions of the prisoner.

The counsel for the prisoner requested the court to charge " that if it appeared by the evidence that the condition of the prisoner from intoxication was such as to show that there was no intention or motive to commit the crime of murder, that the jury should find a verdict of manslaughter." The court refused to charge as requested, but charged " that under the old law, intoxication was an aggravation of crime, but that intoxication never excused crime unless it was of the degree to deprive the offender of his reasoning faculties."

The prisoner was indicted and tried for murder, and, under an indictment for murder, he could be convicted of either murder or manslaughter.

The deceased was killed by the blow which the prisoner struck with some deadly instrument; deadly, because it produced death. The prisoner said it was a common

Rogers *v.* The People.

pocket knife; from the evidence of Dr. Hassel, who made the *post mortem* examination, it is probable it was a large knife, or a dirk knife.

The meeting between the prisoner and the deceased, on the occasion when the prisoner stabbed the deceased, was not premeditated; there was no evidence, nor even a pretence that the prisoner knew the deceased, or had ever seen him before; there was nothing other than what took place on the occasion, to show that the prisoner, when he struck the fatal blow, intended to kill the deceased. The attack was sudden, and if the prisoner intended to kill the deceased, that intention was formed on the spot; either when he struck the fatal blow which produced death, or a few moments before.

If the prisoner did intend to kill the deceased when he struck the fatal blow, he was guilty of murder, though his intention or design to kill preceded the blow but an instant. ( *The People* v. *Clark,* 3 *Seld.,* 385; *The People* v. *Sullivan, id.,* 396; 2 *R. S.,* 657, § 5.)

If the prisoner struck the fatal blow in the heat of passion, without the intention or design to kill, he was guilty of one of the degrees of manslaughter only. (2 *R. S.,* 661, §§ 10, 12.)

The whole question was one of intent, to be inferred by the jury from the material circumstances of the case; and every circumstance in the case was material, which the jury was authorized to take into consideration on the question of intent.

Was the intoxication of the prisoner on that occasion a circumstance which the jury were authorized to consider in determining whether the fatal blow was struck with the intention to kill?

We think it was.

The affair was sudden; there was evidence of a mutual combat. The two companions of the prisoner, sworn on the part of the people, testifying that blows passed between

the prisoner and the deceased, the deceased striking first. All the witnesses, including Mrs. Swanston, agree in saying that, as the prisoner and his companions, in their nocturnal excursion of city rowdyism, accidentally met the deceased and his wife, and rudely came in contact with the person of Mrs. Swanston, the deceased turned around and spoke to them. The prisoner, stopping, says: "What is that you say?" The deceased answers, "What is that to you?" According to Mrs. Swanston's account, the prisoner then broke away from his companions and struck at her husband, aiming the blow at his breast, and then ran up the avenue. According to the account of the prisoner's two companions, blows passed before the fatal blow, as before stated. Mrs. Swanston says, that as the prisoner and his companions were coming down the avenue, approaching her and her husband, "they were three abreast, walking down and speaking loud, as if *excited, angry and quarreling*."

Now we do not say what weight the intoxication of the prisoner and his companions ought to have had with the jury on the question of intent, had that circumstance been submitted to them, with the other circumstances in the case, for their consideration. Nor will we by any means say that had that circumstance been so submitted, we should have felt bound to disturb the verdict, as against the weight of evidence, had they found the prisoner guilty of murder.

But the violent homicide for which the prisoner was tried had different degrees, depending on the intent to kill, or the absence of such intent. The statutory definition of two of the degrees of manslaughter implies not only that a homicide committed in the heat of passion may have been committed without the intention to kill, but also that such heat of passion is likely to prevent the reasoning, calculation, reflection or design implied by a particular intent.

Can any one say that intoxicating drinks taken into the body do not tend to intoxicate the mind, and to inflame the passions? that they do not tend to make anger and other

revengeful passions more excitable? Can any one say that intoxication does not tend to produce a confusion of mind of material consideration on the question of a specific intent, where, from all the other circumstances in the case, it is evident the intent originated on the spot, but an instant before the blow, or cotemporaneously with the will to strike the blow?

All human experience proves the contrary.

No doubt great caution is necessary in the application of this doctrine.

We do not say that it should be applied in any case where there is evidence of premeditation, *aliunde* the circumstances of the affray, or occasion on which the homicide was committed; for we know that it is not unusual for criminals to fortify themselves for crime with liquor. But in homicides of different degrees according to the intent, and in larcenies, forgeries and other crimes, depending on intent or knowledge, in many cases the intoxication of the prisoner is a material circumstance for the jury. Surely, it would not be legal or right to convict a man of passing a counterfeit bill, knowing it to be counterfeit, when he was so intoxicated as not to know a counterfeit bill from a genuine one, without proof to show that previous to his intoxication he knew it was counterfeit.

In this case, we think the court below erred in withdrawing the attention of the jury from the circumstance of intoxication in the manner the case shows.

The counsel for the prisoner substantially requested the court to charge the jury that they had a right to take the intoxication of the prisoner into consideration, with the other circumstances of the case, in determining the intent, and that if they found that there was no intention to commit the crime of murder, the jury should find a verdict of manslaughter.

The Court by refusing to so charge, and thereupon charging that intoxication was an aggravation of crime, that it

" never excused crime unless it was of a degree to deprive the offender of his faculties ;" not only erred in refusing to submit the circumstance of intoxication to the jury, for their consideration as to whether they should find the prisoner guilty of murder or manslaughter, but may have led the jury to suppose that his intoxication was absolutely to be weighed against him in settling their verdict as between murder and manslaughter.   And, certainly, had the prisoner been on trial for manslaughter only, his intoxication would have tended to make out, and perhaps to aggravate the crime ; because it would have tended to show, that the prisoner did the act in the heat of passion.

The error of the court below, does not consist in charging the law wrong as far as the court positively charged ; but in giving to the jury good law, on a point where it was applicable, as a reason for refusing to charge other good law as requested, as to the point of intention where *it* was applicable.

It is true, and the law in England and in this country is, that if a man voluntarily makes himself drunk, it is no excuse for any crime he may commit while he is so. ( 1 *Hale,* 7 ; 4 *Bl. Com.*, 26 ; *People* v. *Pine,* 2 *Barb.*, 566.)

But it does not follow, because drunkenness is no excuse for crime, that it is not in some cases, where the question of guilt or innocence is one of intent, or where the degree of the crime on the same facts depends on the specific intent, a material circumstance in determining whether any crime had been committed, or the degree of the crime which had been committed.                                          •

We think that in this case, the right of the prisoner to have the circumstance of his intoxication fairly submitted to the jury on the question of intent, or whether he was guilty of manslaughter or murder, as clear and as well established by law, as the principle that voluntary drunkenness is no excuse for crime.

Rogers *v.* The People.

The principles are consistent with each other. (*Am. Cr. L.*, §§ 41–44, *and cases there cited.*)

The prisoner stands confessedly guilty of a great crime, and one which from the bold, rowdy recklessness of human life which it and its attending circumstances displayed, calls for a firm condemnation of the law, according to the most stringent, but just rules of its interpretation and its principles, whatever weight his intoxication might have with a jury as to the degree of his crime.

The prisoner has his legal rights, and it is the duty of the court, uninfluenced by the repulsive features of his admitted crime, or the condemnatory comments of an excited public press, to see that those rights are protected, and that he is condemned according to the rules of law.

We think, for the reasons above stated, he may have been prejudiced by not having had the circumstance of his intoxication submitted to the jury with the other circumstances of the case, especially considering the positive charge of the court, and that he is therefore entitled to a new trial.

Judgment reversed and new trial ordered.